# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

# MONROE DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CRIM. ACTION NO. 3:24-00264-14** |
| **VERSUS** | **JUDGE TERRY A. DOUGHTY** |
| **ROY LEE WILLIAMS (14)**<br>   **a/k/a "Mickey"** | **MAG. JUDGE KAYLA D. MCCLUSKY** |

## REPORT AND RECOMMENDATION

Before the undersigned Magistrate Judge, on reference from the District Court, is a motion to suppress [doc. # 283] filed by Defendant, Roy Lee Williams.   For reasons stated below, IT IS RECOMMENDED that the motion be DENIED.

## Background

In early 2024, the Drug Enforcement Agency ("DEA") began an investigation into a drug trafficking organization operating in and around Ruston, Louisiana   During the investigation, agents became aware of a supplier named Cornelius Boston ("Boston"), and, in September 2024, they obtained a Title III wiretap on his phone.   On September 9-10, 2024, agents intercepted calls between Boston and an individual previously unknown to them, Roy Lee Williams ("Williams"), in which they heard Williams seeking to obtain methamphetamine from Boston.

Utilizing the information gleaned from the calls, the investigating agent, Tyler Edmiston, a sergeant with the Lincoln Parish Sheriff's office ("LPSO"), arranged for Stephen Carr, a fellow LPSO deputy, to stop and search Williams' vehicle once Williams had departed his prearranged meeting with Boston.   For the purpose of the anticipated stop, Deputy Carr ran a check on Williams, including his car's license plate number, and learned that Williams had two outstanding traffic warrants and did not have car insurance, all of which provided him with reasonable suspicion to stop the vehicle.

Shortly after he initiated the stop, and as soon as he engaged with Williams at the car's driver's side window, Carr detected the distinctive odor of marijuana.   Based on the information provided by Sergeant Edmiston and the marijuana smell, Deputy Carr searched the vehicle and quickly discovered a backpack with two large bags containing 1,800 grams of marijuana and multiple baggies of cocaine, as well as locating four ounces of methamphetamine beneath the driver's seat.

On March 19, 2025, a federal grand jury returned a seven-count superseding indictment against fourteen Defendants, and, as pertinent here, two counts against Defendant, Williams, charging him in Counts 1 and 7 with conspiracy to distribute and possession with intent to distribute methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii) and 846. The superseding indictment also included forfeiture allegations.

On July 2, 2025, Williams was named in a second superseding indictment that reasserted the same counts against him.   [doc. # 179].   Williams was arraigned on September 9, 2025, and entered a plea of not guilty as to each count.   (Minutes [doc. # 253]).

On October 10, 2025, Williams filed the instant motion to suppress all evidence obtained as a result of the alleged unlawful stop, detention, and search of his person and vehicle, pursuant to the Fourth and Fourteenth Amendments to the United States Constitution, Article Five of the Louisiana Constitution, and applicable statutory authority.   Williams urged several grounds in support of his motion to suppress.   He argued that the Government "used intercepted communications to orchestrate a traffic stop but failed to disclose the wiretap nexus to the defendant or to the Court."   [doc. #283, p. 3].   Thus, the traffic stop "impermissibly circumvented statutory disclosure requirements and violate[d] both Title III and due process." *Id.* He also alleged that the license suspension and insurance violations were pretextual and, consequently, "[a]bsent the tainted Title III derivative evidence, officers had no lawful basis to

stop [his] vehicle." *Id.* at p.4.   Finally, he argued that the search incident to arrest was overly broad because it "exceeded the permissible scope of a search tied to officer safety or evidence of the traffic violation." *Id.*

The Government filed is response and supplemental response on October 22, and November 2, 2025, respectively.   [doc. #s 285-286].

A hearing was held on November 3, 2025, where the Court heard testimony from three Government witnesses:   Tyler Edmiston ("Sergeant Edmiston" or "Edmiston"),[1] Brad Wall ("Captain Wall" or "Wall"),[2] and Stephen Carr ("Deputy Carr" or "Carr")[3].   (Witness List [doc. # 299]).   The Court also received into evidence, without objection, seven Government exhibits:

1) September 4, 2024 Order Authorizing the Interception of Wire Communication for a cellular telephone number utilized by Cornelius Boston;

2) September 4, 2024 Authorization by Deputy Assistant Attorney General for Interception of Wire or Oral Communication;

3) September 9, 2024 audio recording intercepted by agents;

4) Zuercher program screenshot containing Roy Williams' related telephone numbers;

5) September 10, 2024 audio recording, at 11:07 a.m., intercepted by agents;

6) September 10, 2024 audio recording, at 12:13 p.m., intercepted by agents; and

---

[1] Edmiston is a sergeant with the LPSO.   He was in corrections from 2013 to 2016 before transferring to the patrol division from 2016 to 2023.   Since January 2024, he has served as a DEA task force officer.   Edmiston has attended several classes pertaining to narcotics distribution transactions, including traffic stops.

[2] Brad Wall is a 20-year veteran with the LPSO and has achieved the rank of captain.   For the past eleven years, he has been assigned to LPNET (Lincoln Parish Narcotics Enforcement Team).   Moreover, for the past five years, he also had been a member of the DEA Task Force.

[3] Carr has served as a deputy with the LPSO since 2018 and served in the patrol division since 2020.   In 2022, Carr became a K-9 handler.   Carr received training on how to recognize the odor of marijuana.

3

7)  September 10, 2024 video and partial audio recording from Stephen Carr's body
camera.

(Exhibit List [doc. # 300]).

Following the hearing, the Court took the matter under advisement.

## Relevant Testimony and Evidence

In January 2024, the DEA began an investigation into a drug trafficking organization operating in and around Ruston, Louisiana.   The initial target of that investigation was Shederick Green ("Green"), who agents believed was distributing methamphetamine and cocaine.

During a controlled purchase on March 12, 2024, Green placed a call to a phone number that agents were able to determine was associated with Cornelius Boston ("Boston"). Accordingly, agents shifted their focus from Green to Boston, who they suspected was one of Green's suppliers.

Pursuant to the investigation, agents conducted physical surveillance of Boston and learned that he was storing at and distributing narcotics from 1313 State Street, two addresses on Fountain Drive,[4] an address off of South Maple Street, plus one in Sulphur, Louisiana.

After identifying Boston as a potential supplier, agents utilized a confidential source to make a controlled purchase of two ounces of methamphetamine from Boston on August 13, 2024.   Agents did not arrest Boston at that time because they wanted to try to uncover his supply source.   In short, they wanted to try to dismantle his direct trafficking organization.   Therefore, agents applied for a wiretap.

---

[4] Fountain Drive is comprised of duplexes, known as the Peachtree Apartments, and only has a single means of ingress/egress.

On September 4, 2024, agents obtained a Title III wiretap for Boston's cellular device. Judge Doughty signed the order authorizing the wiretap and, in so doing, found that there was probable cause to believe that intercepted communications of Boston's phone would reveal, *inter alia*, the identities of others involved in narcotics trafficking activities.   (Sept. 4, 2024 Order Authorizing the Interception of Wire Communications; Gov.'t Exh. 1).[5]   As it turns out, that is exactly what occurred.

At 6:36 p.m. on September 9, 2024, agents intercepted an incoming call to Boston from 318-xxx-xxxx.   (Gov.'t Exh. 3).   With the exception of the greeting, the conversation is reproduced below,

| UM:[6] | You think you could bring me, uh, three on that clear, to my job? |
|---|---|
| BOSTON: | Shit, uh, I ain't down there yet bro. It's gonna, uh, be a few hours before I can get back on that end. |
| UM: | Oh, that's cool cause I don't get off till eleven anyways. |
| BOSTON: | I'm thinking 'round, what time is it? About nine, make it about nine thirty, shit, about nine, 'bout ten something. So if you still want me to bring it, I will, it's on you. |
| UM: | Hell yeah, I need it. |
| BOSTON: | I'll be there 'bout ten something though. |
| UM: | Aight. |

---

[5] The application was authorized by Deputy Assistant Attorney General Jennifer Hodge, a duly designated official of the U.S. Department of Justice pursuant to power delegated by the Attorney General of the United States.   *Id*.; *see also* May 31, 2024 Special Designation of Certain Officials . . . to Authorize Applications for Court Orders for Interception of Wire or Oral Communications, signed by then-Attorney General Merrick B. Garland; and Sept. 4, 2024 Authorization for Interception Order Application, signed by Jennifer Hodges; Gov.'t Exh. 2.

[6] "UM" represents the as-then unidentified male who initiated the call to Boston.

BOSTON: Aight baby.

*Id.*

By that point, agents had been monitoring Boston's cell number for approximately four days and were familiar with his voice.   However, they initially did not know the identity of the initiating caller.   The caller, whose voice sounded male, wanted Boston to provide him with three ounces of "clear."   Sergeant Edmiston is familiar with terms used to describe narcotics. "Clear" is one of several terms used to refer to methamphetamine.   Edmiston believed that the caller intended a quantity of three ounces, rather than grams, because prior intercepted calls indicated that Boston was a larger scale distributor, who was less likely to sell smaller quantities in grams.

After the call, agents searched Zuercher[7] utilizing the UM's cell number from the intercepted call.   Zuercher returned a "hit" for the number, revealing that it was associated with a lone individual -- Roy Lee Williams.   *See* Zuercher Screen Printout; Gov't Exh. 4.   Zuercher also disclosed an address for Williams at 1104 South Farmerville Street, Ruston, Louisiana. Prior to this time, Williams had not been on agents' radar.

The next call that agents intercepted between Boston and the now-identified Williams occurred the following day, September 10, 2024:

WILLIAMS: Whoa.

BOSTON: Yo, yo bruh. I had made it in late night, where you at?

WILLIAMS: Um, on my way to the house, like right down the road from the house.   Hey, bring that four way over and shit.

---

[7] Zuercher is a department database that aggregates information from calls for service placed to the LPSO.

6

BOSTON:        Oh that's a bet. Give me about twenty, thirty minutes. I'm about to be to ya.

WILLIAMS:    Aight.

BOSTON:        Aight.

(Gov.t. Exh. 5).

Edmiston confirmed that the two voices heard on the call were those of Boston and Williams.   Furthermore, the conversation revealed that the transaction had changed from Williams' jobsite to Williams' house and the quantity had changed from three ounces to four ounces.

After intercepting this call, at 11:10 a.m., Sergeant Edmiston contacted Deputy Carr because Carr had a K-9 unit.   Edmiston had multiple conversations with Carr that day.   Because of the sensitivity of the case, Edmiston did not disclose to Carr the existence of the Title III wiretap.   Captain Wall testified that it was common for investigators utilizing a wiretap not to disclose that sensitive detail to local officers who conduct "walled off" traffic stops.

Agents also began conducting surveillance of Williams' residence.   Captain, and fellow Task Force Officer ("TFO"), Wall was one of the agents conducting surveillance.   Wall observed Williams at the residence where a gold Buick was parked outside.   A database search of the Buick's license plate number revealed that Williams was the registered owner of the vehicle. Wall conveyed his observations regarding Williams and the Buick to Edmiston.   Agents also forwarded the Buick's license plate number to Deputy Carr.

Meanwhile, Edmiston and another TFO, Smith, maintained surveillance on Boston, who was at Griff's Restaurant in Ruston, Louisiana.   Agents had a "ping" on Boston's cell phone to help track his location.

7

At some point, Boston left Griff's Restaurant and traveled to Fountain Drive, presumably to obtain the methamphetamine for the anticipated transaction with Williams.   After Boston arrived at the Fountain Drive location, he placed a call to Williams, which agents again intercepted and recorded.   The conversation was brief:

> WILLIAMS:  Whoa.
>
> BOSTON:     Yo, bro.
>
> WILLIAMS:  Yeah.
>
> BOSTON:     Hey, can you meet me on Peachtree?
>
> WILLIAMS:  Yeah, yeah that's good.
>
> BOSTON:     I'll be on Peachtree in about ten minutes.
>
> WILLIAMS:  Alright.

(Gov.'t Exh. 6).   Edmiston interpreted the conversation to mean that the location of the transaction had been changed to the Peachtree Apartments on Fountain Drive.[8]

In addition to providing Deputy Carr with the license plate number for the gold[9] Buick sedan, Edmiston disclosed to Carr the amount of the narcotics that would be inside the car, Williams' identity and his description.   He also explained to Carr that the Buick sedan would be traveling to Fountain Drive/Peachtree and then returning northbound on South Farmerville Street.   Edmiston asked Carr to "stage up" on South Farmerville Street to conduct the traffic stop.

---

[8] While monitoring Boston's cellular device on other occasions, agents had intercepted calls where Boston had directed people to the Peachtree Apartments.

[9] Carr described the vehicle as tan in color.

As Edmiston was talking to Carr, a little over one hour before the stop, Carr ran the license plate for the Buick, which showed that it had no insurance.   Carr also learned that Williams had two outstanding warrants.   Therefore, even before Williams left his house on South Farmerville Street, agents knew that Williams had outstanding warrants and was driving without insurance.

After intercepting the latest call between Williams and Boston, agents observed Williams exit his residence, enter his gold Buick sedan, and then proceed directly to the Peachtree Apartments on Fountain Drive.   Captain Wall tailed the Buick as it left the house and followed it continuously to Boston's location on Fountain Drive.   Wall conveyed this information to Sergeant Edmiston.

Williams' visit at the apartment complex lasted approximately one minute, which was consistent with narcotics transactions that are typically very brief in duration.

At approximately 12:25 p.m., Deputy Carr observed the subject Buick sedan headed northbound on South Farmerville Street.   Carr testified that he ran the Buick's license plate just minutes before the stop, and, consequently, initiated a traffic stop for no insurance.   Carr's body camera captured the events that occurred during the traffic stop.

After stopping the sedan, Deputy Carr walked to the Buick's open driver's side window and told Williams, who was the lone occupant, that the reason for the stop was because he had no insurance.   As Carr talked to Williams through the open window, he detected the odor of marijuana.   However, Carr did not tell Williams that he had smelled marijuana in order to keep him calm.   Carr also did not document the odor of marijuana in his report and first disclosed to

the Government that he smelled marijuana only three business days before the suppression hearing.

Carr returned to his police unit and called dispatch with Williams' Louisiana Identification Number information.   After a few minutes, dispatch advised Carr that Williams' driver's license had been indefinitely suspended and that he had failure-to-appear warrants for swapping plates and driving under suspension.   Carr already had requested backup, so someone could stay with Williams while he searched the vehicle.   Carr testified that he intended to search the Buick, not only because of the odor of marijuana, but also because of the information provided by Agent Edmiston.

Approximately four minutes into the stop, Deputy Carr returned to the Buick and had Williams exit the sedan and accompany him to the rear of the vehicle.   Carr informed Williams that he had two outstanding traffic warrants.   Roughly one minute later, Carr patted Williams down and explained that he was handcuffing him because of the traffic warrants.   Carr testified that he handcuffed Williams for officer safety.   After that, Williams no longer was able to reach inside the vehicle.

Approximately seven minutes into the stop, Deputy Derek Johnson arrived on scene.   At the eight-minute mark, Carr advised Williams that the police department wanted him arrested on the warrants.   Accordingly, Carr advised the still-handcuffed Williams of his *Miranda* rights.

Nine minutes after initiating the stop, Deputy Carr returned to the open window of the Buick's driver side door where he again detected the smell of marijuana.   He then opened the driver side door and began to search the vehicle.[10]

---

[10]  The Government stipulated that, as Carr opened the door, Williams asked Deputy Johnson

Thirty seconds into the search, Carr received a phone call from Edmiston asking to find out what he had uncovered.   After a few seconds, Carr muted the microphone on his body camera.   Carr testified that he muted the camera because LPNET conducts sensitive investigations and he did not know whether the information should be "out there."   Carr agreed that muting the call was a proactive measure to ensure that sensitive investigation information remained confidential.   He testified that it was very common to do this when working with LPNET or the DEA.[11]

Carr quickly pulled a burgundy backpack from the back seat of the car.   A little over one minute into the search, Carr opened the backpack and discovered two large plastic bags containing what was later confirmed was over 1,800 grams of marijuana.   Although one bag of marijuana was tied, the other had a "pretty large" hole in it.   In fact, when Carr removed the marijuana, some of it fell out.   He also found three baggies of what he believed to be was cocaine in the front pocket of the backpack.   Approximately four minutes after the search started, Carr found a baggie under the driver's seat that later was determined to contain four ounces of methamphetamine.

---

why Carr was searching his vehicle.   In an apparent response to Williams' query, Carr yelled back, "I told you man, the . . . insurance."   However, it is not clear that Carr heard Williams' actual question.   Carr likely was responding to why he stopped the vehicle.

[11] Edmiston testified that he did not think Carr needed to mute the body camera and that he, Edmiston, would not have done so in that situation.   Edmiston added, however, that it was not uncommon for officers to mute their body cameras if they had a reason to do so such as talking about the outcome of a case.   He testified that it was uncommon to do so during a search for narcotics after a traffic stop.

Carr testified that he did not include the details provided by Sergeant Edmiston in his arrest report because the information was sensitive.   He was concerned that, after the report was filed, the public might be able to access it.   According to him, this was standard practice.

Carr also did not disclose in his report that he detected marijuana prior to the search.   He attributed this to an oversight.   He acknowledged that he should have included that information in the report.   However, he remained adamant that he smelled marijuana emanating from the Buick prior to the search.   He also maintained that his prior conversations with Edmiston provided him with grounds to search the vehicle.

Carr explained that, although he stated in his report that the search was conducted incident to Williams' arrest, he, in fact, searched the vehicle based on what Edmiston had told him, as well as the odor of marijuana.   Carr testified that he had searched other vehicles based upon his own detection of the odor of marijuana without utilizing his K-9.[12]

### Law and Analysis

The Fourth Amendment of the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. CONST. AMEND. IV.[13]   The protections of the Fourth Amendment extend to

---

[12] Carr's practice was not to deploy his K-9 whenever he had consent to search the vehicle or when he smelled marijuana on his own.

[13] In his brief, Williams also invoked Article V of the Louisiana Constitution and "applicable statutory authority."   It is manifest, however, that "[t]he question that a federal court must ask when state officials secure evidence to be used against a defendant accused of a federal offense is whether the actions of the state officials violated the Fourth Amendment of the United States Constitution."   *United States v. Jones*, 185 F.3d 459, 463 (5th Cir. 1999) (quoting *United States v. Walker,* 960 F.2d 409, 415 (5th Cir. 1992) (internal quotation marks omitted).   Therefore, "[w]hether the Fourth Amendment has been violated is determined solely by looking to federal law on the subject."   *Walker*, 960 F.2d at 415-16; *United States v. Guerrero*, 500 F. App'x 263,

12

the states through the Fourteenth Amendment.   *Dunaway v. New York*, 442 U.S. 200, 207 (1979).   "A defendant normally bears the burden of proving by a preponderance of the evidence that the challenged search or seizure was unconstitutional.   However, where a police officer acts without a warrant, the government bears the burden of proving that the search was valid." *United States v. Waldrop*, 404 F.3d 365, 368 (5th Cir. 2005) (internal citations omitted).

Generally, "evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search or seizure.   This prohibition applies as well to the fruits of the illegally seized evidence."   *United States v. Wallace*, 885 F.3d 806, 810 (5th Cir. 2018) (quoting *United States v. Calandra*, 414 U.S. 338, 347 (1974)).   The purpose of this exclusionary rule is to deter unlawful police conduct:   by refusing to admit evidence gained as a result of conduct that deprives the defendant of some right, "the courts hope to instill in those particular investigating officers, or in their future counterparts, a greater degree of care toward the rights of the accused."   *United States v. Pope*, 467 F.3d 912, 916 (5th Cir. 2006) (quoting *United States v. Leon*, 468 U.S. 897, 919 (1984)).   However, the exclusionary rule is not without limits and suppression of evidence should be "ordered only on a case-by-case basis and only in those unusual cases in which exclusion will further the purposes of the exclusionary rule."   *Id.*

I.    **The Stop and Detention**

"A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, by means of physical force or show of authority, terminates or restrains his freedom of movement, through means intentionally applied."

---

265 (5th Cir. 2012).

*Brendlin v. California*, 551 U.S. 249, 254 (2007) (citations and internal quotation marks omitted).   A traffic stop constitutes a seizure under the Fourth Amendment, and its legality is analyzed under the framework set forth in *Terry v. Ohio*, 392 U.S. 1 (1968).   *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005) (citations omitted); *see also Brendlin*, 551 U.S. at 555 (a traffic stop entails a seizure of the driver for purposes of the Fourth Amendment). *United States v. Brigham*, 382 F.3d 500, 506 (5th Cir. 2004) (en banc) (same).   Traffic stops, whether supported by probable cause or a reasonable suspicion, are treated as *Terry* stops. *Brigham,* 382 F.3d at 506 (citations omitted).

A *Terry* analysis is two-tiered:   (1) whether the officer's action of stopping the vehicle was justified at its inception; and (2) whether the officer's actions were reasonably related in scope to the circumstances that justified the stop.   *United States v. Shabazz*, 993 F.2d 431, 435 (5th Cir. 1993) (citing *Terry*, 392 U.S. at 19-20); *United States v. Valadez*, 267 F.3d 395, 398 (5th Cir. 2001).

A.    The Initial Stop

"Under *Terry*, a law enforcement officer may temporarily detain a person when the "officer has a reasonable, articulable suspicion that a person has committed or is about to commit a crime." *United States v. Chavez*, 281 F.3d 479, 485 (5th Cir. 2002) (citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968)).   Reasonable suspicion may be described as "'a particularized and objective basis' for suspecting the person stopped of criminal activity."   *Id*. (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996)).   To satisfy the Fourth Amendment, the stopping officer must be able to "articulate more than an 'inchoate and unparticularized suspicion or "hunch"' of criminal activity."   *Id*. (citing *Illinois v. Wardlow*, 528 U.S. 119, 123-24 (2000)).   Nonetheless,

14

the Fourth Amendment requires but a "minimal level of objective justification for making the stop," and requires "a showing considerably less than preponderance of the evidence." *Id*. (citation omitted). The validity of the stop is determined under "the totality of the circumstances-the whole picture." *Id*. (citing *United States v. Sokolow*, 490 U.S. 1, 7-8 (1989)).

In this case, the traffic stop was justified at its inception because, immediately prior to the stop, Deputy Carr conducted a computer check and learned not only that Williams had two failure-to-appear warrants, but also that he was operating an uninsured vehicle. *See, e.g*., La. R.S. § 863.1 (proof of insurance requirement).[14] An officer's knowledge that a motor vehicle operator has outstanding traffic warrants provides a valid basis for the officer to stop the vehicle. *United States v. Wheeler*, 145 Fed. App'x. 894, 895 (5th Cir. 2005). Moreover, "a violation of [a] traffic law, revealed by a computer check of a license plate, generally gives rise to probable cause sufficient to stop and arrest a suspect." *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 529 (5th Cir. 1999); *United States v. Broca-Martinez*, 855 F.3d 675, 680–81 (5th Cir. 2017) (a state computer database indication of insurance status may establish reasonable suspicion when the officer is familiar with the database and the system itself is reliable).[15] Even if the database that Carr consulted was not conclusive, it was sufficient to establish reasonable suspicion. *Broca-Martinez*, 855 F.3d at 681.

Williams contends that the stop was pretextual, i.e., that the real motivation for the stop was to uncover the drugs from the recently completed transaction between Boston and Williams,

---

[14] Furthermore, if a motorist is unable to show proper proof of insurance, then the vehicle "shall be impounded." *United States v. Swan*, 259 Fed. App'x. 656, 659 (5th Cir. 2007) (citing La. R. S. § 32:863.1(C)(1)(a)).

[15] A motorist has no privacy interest in his license plate number. *Id*. (citations omitted).

a transaction allegedly tainted by improper use of the wiretap.   It is manifest, however, that the constitutional reasonableness of traffic stops does not depend on the actual motivations of the individual officers involved.   *Whren v. United States*, 517 U.S. 806, 813 (1996).   "Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."   *Id*.   "An officer may stop a motorist for a traffic violation even if, subjectively, the officer's true motive is to investigate unrelated criminal offenses."   *United States v. Sanchez-Pena*, 336 F.3d 431, 437 (5th Cir. 2003).

Furthermore, whether intended or not,[16] information gleaned from the wiretap, together with the agents' surveillance of Williams and Boston, provided Carr with reasonable suspicion (and probable cause) to believe that Williams possessed methamphetamine at the time he stopped the car.   Reasonable suspicion depends upon the "totality of the circumstances and the collective knowledge and experience of the officer or officers."   *United States v. Estrada*,   459 F.3d 627, 631-632 (5th Cir. 2006) (citation omitted).   Deputy Carr was entitled to rely upon the collective knowledge of all the agents and deputies involved in the investigation of Williams and his vehicle.   *United States v. Hernandez*, 477 F.3d 210, 215 n.13 (5th Cir. 2007) (citation omitted).   "Under the collective knowledge doctrine, it is not necessary for the arresting officer to know all of the facts amounting to probable cause, as long as there is some degree of communication between the arresting officer and an officer who has knowledge of all the necessary facts."   *United States v. Ibarra*, 493 F.3d 526, 530 (5th Cir. 2007) (citation omitted).

Pursuant to the investigation, agents knew that Boston was distributing narcotics from the Peachtree Apartments on Fountain Drive and even had previously conducted a controlled

---

[16] Edmiston's goal was for Carr to conduct a walled-off traffic stop.

purchase from him using a confidential source.   With the assistance of the wiretap, Sergeant Edmiston listened to phone conversations between Boston and Williams wherein Williams agreed to go to the Peachtree Apartments to obtain four ounces of "clear" or methamphetamine from Boston.   Immediately prior to the arranged meeting, Captain Wall followed Williams from his residence to Fountain Drive where Williams remained for only one minute before he left and was stopped by Deputy Carr.   Wall kept Sergeant Edmiston apprised of his observations, and Edmiston, in turn, remained in contact with Deputy Carr.

The cumulative effect of these facts provided Deputy Carr with reasonable suspicion to effect the stop, as well as probable cause to search the vehicle.   *See* discussion, *infra*; *Maryland v. Dyson*, 527 U.S. 465, 465-66 (1999) (probable cause to stop and search car where deputy had received tip that driver had gone to New York to buy drugs); *United States v. Khanalizadeh,* 493 F.3d 479, 483 (5th Cir. 2007) (officer had reasonable suspicion to stop vehicle when relying on FBI wiretaps and previous surveillance indicating defendant was involved in drug trafficking even though he did not have personal knowledge of the evidence uncovered by the FBI); *United States v. Benard*, 680 F.3d 1206, 1210 (10th Cir. 2012) (officers had probable cause to stop and search car based on intercepted phone calls from which they inferred that defendant intended to buy cocaine from a tire store, despite the fact that he sometimes bought actual tires there).

Citing *United States v. Giordano*, 416 U.S. 505 (1974), Williams asserted that evidence obtained outside the scope of the wiretap without proper disclosure and minimization must be suppressed.   To be sure, *Giordano* recognized that evidence must be suppressed if agents obtain evidence in violation of certain provisions of Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510-2520 ("Title III").   *Giordano*, 417 U.S. at 508.

17

However, the issue in *Giordano* was that the wiretap application was not authorized by a statutorily designated official. *Id*. That issue is not present here. *See* Gov.'t Exh. 2. Moreover, Williams did not identify any specific provision of Title III that agents purportedly violated in this case. Thus, *Giordano* is of no moment, and the first *Terry* prong has been established.

    B.    <u>Continued Detention</u>

Under *Terry*'s second prong, the detention "must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Brigham*, 382 F.3d at 507. "During a traffic stop, a police officer may examine a driver's license and vehicle registration, [and] run a computer check on the driver and the vehicle." *Zavala*, 541 F.3d at 576. An officer "must ensure that the driver does not have a warrant or a suspended license, and that the vehicle is registered and not reported stolen. These checks are routine and quickly performed." *Id.* at 577. An officer "may also ask about the purpose and itinerary of the occupant['s] trip as part of [his] investigation," because these questions are "reasonably related in scope to his investigation of the circumstances that caused the stop." *United States v. Pack*, 612 F.3d 341, 350 (5th Cir.), *opinion modified on denial of reh'g*, 622 F.3d 383 (5th Cir. 2010). Furthermore, an officer may question the driver on matters unrelated to the purpose of a traffic stop, "so long as these unrelated questions do not extend the duration of the stop." *Id.*

    "[T]he tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's mission—to address the traffic violation that warranted the stop and attend to related safety concerns." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015). "Because addressing the infraction is the purpose of the stop, it may last no longer than is necessary to

effectuate th[at] purpose."  *Id.*  (internal quotations omitted).   The authority for the seizure "ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.*   Thus, although certain unrelated inquiries that do not lengthen a roadside detention are permissible, a traffic stop "can become unlawful if it is prolonged beyond the time reasonably required to complete [its] mission."  *Illinois v. Caballes*, 543 U.S. 405, 407 (2005).

"In order to continue a detention after such a point, the officer must have a reasonable suspicion supported by articulable facts that a crime has been or is being committed."  *United States v. Santiago*, 310 F.3d 336, 342 (5th Cir. 2002).   "[I]f additional reasonable suspicion arises in the course of the stop and before the initial purpose of the stop has been fulfilled, then the detention may continue until the new reasonable suspicion has been dispelled or confirmed." *Lopez-Moreno*, 420 F.3d at 431 (5th Cir. 2005) (citations omitted).

After he initiated the stop, Deputy Carr engaged with Williams at the driver's side window of the Buick.   In response to Carr's inquiries, Williams was unable to produce a driver's license or proof of insurance.   Carr returned to his unit and called in Williams' Louisiana identification number and quickly confirmed that Williams's driver's license was suspended indefinitely and that he had two outstanding failure-to-appear warrants.   The foregoing circumstances provided Carr with reasonable suspicion to extend the stop.

Furthermore, Deputy Carr testified that, as soon as he engaged with Williams at the Buick's driver's side window, he detected the odor of marijuana.   While Carr never mentioned smelling marijuana on his body camera and did not include it in his report, the Court nonetheless credits his testimony, not only because of his demeanor at the hearing, but also because it would not be surprising for him to smell marijuana given the large quantity of marijuana discovered in

19

the backpack, including some that had spilled out from a bag inside the backpack.[17]   *See United States v. Perez-Perez*, Civ. Action No. 23-0188, 2024 WL 5426631, at *4 (W.D. Tex. Oct. 15, 2024), *R&R adopted,* 2025 WL 597091 (W.D. Tex. Feb. 24, 2025) (crediting agents' testimony that they smelled marijuana coming from the vehicle, despite the fact that the arresting trooper did not recall the smell of marijuana and did not include it in his report).   The marijuana odor provided Carr with an additional basis to extend the stop and probable cause to search the car. *See* discussion, *infra*.

Also, instead of developing an independent basis for a search, as apparently intended by Sergeant Edmiston, it appears that Carr remained fixated on the agents' collective knowledge that the car contained narcotics.   Indeed, the prior evidence accumulated by Sergeant Edmiston, and other agents, provided Carr with a further basis to extend the stop, as well as probable cause to search the car.   *See* discussion, *infra*.

In sum, the officer's actions demonstrated a "graduated response to emerging facts, [which] were reasonable under the totality of the circumstances, and did not unconstitutionally extend [defendant's] detention."   *United States v. Pauyo*, 341 Fed. App'x. 955, 956 (5th Cir. 2009) (citation omitted).

---

[17]  At the hearing, defense counsel questioned Carr's credibility because of his failure to deploy his K-9, which had been trained to detect the odor of narcotics.   Carr explained, however, that he did not use the K-9 when he was able to smell marijuana on his own.   Moreover, given the considerable ease with which the K-9 could have been retrieved from the backseat of Carr's unit, his decision not to utilize the K-9 readily supports Carr's explanation that he smelled the marijuana on his own.

II.    **Vehicle Search**

A.  Automobile Exception

It is manifest that, "searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions." *California v. Acevedo*, 500 U.S. 565, 580 (1991).   One such exception that is "specifically established and well-delineated" is the so-called automobile exception.   *United States v. Ross*, 456 U.S. 798, 825 (1982).   The automobile exception allows police to search a vehicle if they have probable cause to believe that the vehicle contains contraband." *United States v. Fields*, 456 F.3d 519, 523 (5th Cir. 2006) (citing *Maryland v. Dyson*, 527 U.S. 465, 467 (1999)).   "[T]he automobile exception does not have a separate exigency requirement:   'If a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment . . . permits police to search the vehicle without more.' " *Dyson*, 527 U.S. at 467 (quoting *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996) (per curiam)).   Probable cause to search the vehicle "depends on the totality of the circumstances viewed in light of the observations, knowledge, and training of the law enforcement officers involved in the warrantless search." *United States v. McSween*, 53 F.3d 684, 686 (5th Cir. 1995) (internal quotations omitted).

The law in the Fifth Circuit is clear:   if officers smell marijuana coming from inside the vehicle, they have probable cause to search the vehicle. *See United States v. Lork*, 132 F. App'x 34, 35-36 (5th Cir. 2005) (per curiam) (holding that, after conducting a lawful traffic stop for speeding, the officer detected an odor of marijuana emanating from the defendant's vehicle, thereby creating probable cause to search vehicle); *United States v. Reed*, 882 F.2d 147, 149 (5th

Cir. 1989) (detection of marijuana odor emanating from vehicle provides law enforcement with probable cause to search vehicle); *United States v. Henke*, 775 F.2d 641, 645 (5th Cir. 1985) ("Once the officer smelled the marijuana, he had probable cause to search the vehicle."); *United States v. Ibarra-Sanchez*, 199 F.3d 753, 760 (5th Cir. 1999) ("Regardless of precisely how near or far from the van the officers were when they detected the odor, once they did so they possessed probable cause to search").

Furthermore, "if probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." *Ross*, 456 U.S. at 825. The search may include containers within the vehicle as long as officers "have probable cause to believe evidence or contraband is contained" inside. *California v. Acevedo*, 500 U.S. 565, 580 (1991).

Here, the Court has credited Deputy Carr's sworn and uncontroverted testimony that he smelled marijuana coming from the stopped vehicle. *See* discussion, *supra*.[18] The marijuana smell provided Carr with probable cause to search the vehicle and its contents. *See United States v. Banks*, Crim. No. 12-0059, 2012 WL 3255596, at *3–4 (M.D. La. Aug. 8, 2012) (smell of marijuana alone provided probable cause to justify search of the vehicle).

---

[18] At the hearing, defense counsel questioned Carr's decision to mute the microphone on his body camera during the search of the vehicle. By the time of his second call from Edmiston, however, Carr already had obtained probable cause to search the vehicle. Consequently, unless Carr wanted to confess to Edmiston that he intended to falsely represent that he had smelled marijuana, the Court does not discern any nefarious purpose for Carr to mute his microphone, pertinent to this motion. Rather, Carr remained steadfast in his explanation that he muted the microphone out of concern for possibly compromising a sensitive narcotics explanation. While perhaps unorthodox (per Sergeant Edmiston), the Court finds Carr's explanation credible.

In addition, the agents' collective knowledge that, immediately prior to the traffic stop, Williams departed a meeting he had arranged for the purpose of obtaining methamphetamine provided Carr with separate probable cause to search the vehicle and its contents. *See* discussion, *supra*.

Accordingly, the Court finds that Carr's warrantless search of the vehicle did not violate the Fourth Amendment, and the evidence seized as a result of the search should not be suppressed.

B. Search Incident to Arrest

Deputy Carr testified that, in his report, he stated that he searched the car incident to Williams' arrest. As defense counsel emphasized at the hearing, the Supreme Court has held that an officer may not search a vehicle incident to a recent occupant's arrest when, as here, the arrestee has been secured and no longer can access the interior of the vehicle. *Arizona v. Gant*, 556 U.S. 332, 335 (2009). Importantly, however, *Gant* did not disturb other established exceptions to the warrant requirement in the vehicle context "when safety or evidentiary concerns demand." *Gant,* 556 U.S. at 346; *United States v. Sicking*, Crim. No. 12-0076, 2012 WL 3886348, at *4 (E.D. Tex. Aug. 8, 2012), *R&R adopted,* 2012 WL 3886329 (E.D. Tex. Sept. 6, 2012) (noting that while *Gant* limited the search-incident-to-arrest exception, *Gant* affirmed the viability of the probable cause exception for automobiles). In fact, *Gant* reaffirmed that if there is probable cause to believe a vehicle contains evidence of criminal activity, then the officer is authorized to search any area of the vehicle in which the evidence might be found. *Id.*, at 347 (citing *United States v. Ross,* 456 U.S. 798, 820–821 (1982). Those circumstances were present here. *See Banks*, 2012 WL 3255596, at *3–4 (distinguishing *Gant* where there was

probable cause to search the vehicle).

Finally, the Court observes that while Carr plainly invoked an inapplicable exception to the warrant requirement in his report, his error is not dispositive. The reasonableness inquiry is objective, not subjective. Moreover, as evidenced by the existence of curative doctrines such as the good faith exception and the inevitable discovery rule, the Fourth Amendment does not require law enforcement officers to be constitutional scholars.

## Conclusion

For the above-stated reasons,

IT IS RECOMMENDED that the motion to suppress [doc. # 283] filed by Defendant, Roy Lee Williams, be DENIED.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and FRCP Rule 72(b), the parties have **fourteen(14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof. A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing. Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR,**

**FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

In Chambers, at Monroe, Louisiana, on this 24th day of November, 2025.

_____

KAYLA DYE MCCLUSKY
UNITED STATES MAGISTRATE JUDGE